Steven P. Brendemuehl (Bar No. 553225)
Law Office of Steven P. Brendemuehl
5 Commonwealth Road ~ Suite 4A
Natick, MA 01760
Phone:  (508) 651-1013
Fax:      (508) 651-0508
Email:   Steven@lawofficespb.com

Attorney for Plaintiffs,
ACK Residents Against Turbines,
and Vallorie Oliver

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ACK RESIDENTS AGAINST TURBINES; and VALLORIE OLIVER, | ) ) ) ) | Case No. |
| Plaintiffs, | ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) AND THE ENDANGERED SPECIES ACT (ESA)** |
| v. | ) ) ) | |
| U.S. BUREAU OF OCEAN ENERGY MANAGEMENT; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE; DEB HAALAND Secretary of the Interior; GINA M. RAIMONDO, Secretary of Commerce, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) ) ) ) | |

## I.   INTRODUCTION

1.     This is an action for declaratory and injunctive relief challenging the failure of the Bureau of Ocean Energy Management (BOEM), an agency within the U.S. Department of the Interior, to comply with the National Environmental Policy Act (NEPA), 42. U.S.C. §§ 4321, *et seq.* and the Endangered Species Act (ESA), 16 U.S.C. § 1531, *et seq.*, when assessing, disclosing, and mitigating the environmental effects of its decision to approve the Vineyard Wind 1 offshore wind project (the "Vineyard Wind project"), proposed for construction off the southern coast of Nantucket, Massachusetts.  Despite preparing an Environmental Impact Statement (EIS) and a Supplement to the EIS (SEIS), BOEM failed to take the requisite "hard look" at the Vineyard Wind project's adverse impacts on whales and other marine mammals, fish, sea turtles, birds, air quality, greenhouse gas emissions, cultural resources, aesthetics, and other resource categories.  BOEM's two NEPA documents also failed to examine a legally adequate range of alternatives; failed to mitigate the project's impacts; and grossly underreported the project's cumulative effects.

2.     For these reasons, alleged in greater detail below, BOEM failed to conduct an adequate environmental review of the Vineyard Wind project and failed to provide the public with the information required by NEPA.

3.     In addition, Plaintiff's challenge both BOEM and the National Oceanic and Atmospheric Administration/National Marine Fisheries ("NOAA/Fisheries") for failing to ensure that the Vineyard Wind project would not jeopardize the survival of

federally-listed species, such as the North Atlantic Right Whale and to avoid jeopardizing the continued existence of such federally-listed species.  (16 U.S.C. § 1536.) Further, the Biological Opinion ("BiOp") that NOAA/Fisheries prepared for the Vineyard Wind project is analytically deficient and not supported by the best available data. By approving the Vineyard Wind project, BOEM violated the procedural and substantive requirements of the ESA.  By issuing a defective BiOp, NOAA/Fisheries also violated the procedural and substantive requirements of the ESA.  This action arises and alleges violations under the ESA (16 U.S.C. §§ 1531, *et seq.*) and the Administrative Procedures Act (APA) (5 U.S.C. §§ 551, *et seq.*).

4.    The North Atlantic Right Whale is perhaps the most iconic marine animal on the eastern seaboard of the United States.  It is also one of the most imperiled species in the entire world, with fewer than 400 individuals known to exist in the wild. Worse, the species is under constant threat from vessel strikes, entanglement in fishing gear, and loss of food sources, resulting in high mortality and low reproduction rates.  In a word, the North Atlantic Right Whale is on the verge of extinction. However, one of its longtime safe havens – where there is ample food and protective areas for birthing and rearing young – is the area immediately south-southwest of Nantucket Island.  Unfortunately, this is the exact place that BOEM has selected for purposes of constructing the largest offshore wind array ever assembled. The Vineyard Wind project is one – but only one – of the offshore wind projects proposed for this area. In the original Draft EIS, however, BOEM did not disclose

*COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF*

that Vineyard Wind was part of a much larger offshore wind program. It was not until Plaintiffs and others criticized BOEM for failing to analyze Vineyard Wind in this larger offshore wind development context, that BOEM agreed to prepare a "supplement" to the Draft EIS that purported to address the Vineyard Wind project's *cumulative* impacts.

5.      NOAA/Fisheries and BOEM also botched the analysis of Vineyard Wind's potential to jeopardize North Atlantic Right Whales and other federally-listed sea animals, including three sea turtle species.  Not only did the BiOp issued for the project assume project parameters different from those ultimately discussed in the Supplement to the EIS (the "SEIS"), the BiOp grossly underreported the likelihood of vessel strikes against listed whale species, relied extensively on unproven and unrealistic mitigation measures to reduce such vessel strikes, and failed to even assess the negative impacts of the Project on whale echolocation, which is the primary means by which whales communicate and navigate.  BOEM and NOAA/Fisheries also failed to take the steps required to ensure the survival of the affected listed species and to facilitate their eventual recovery, as required by the ESA.

6.      The North Atlantic Right Whale and the other listed species affected by the Vineyard Wind project are irreplaceable parts of the fragile ecosystem that exists off the coast of Massachusetts. By failing to comply with NEPA and the ESA, BOEM and NOAA/Fisheries have put that ecosystem and the species within in it in grave

danger, perhaps even pushing at least one species – the North Atlantic Right Whale – to the point of extinction.

7.    In approving the Final EIS – which consists of the original  Draft EIS and the SEIS – BOEM also provided an inadequate analysis of the Vineyard Wind project's impacts on air quality, greenhouse gas (GHG) emissions, cultural resources, aesthetics, growth, hazards, noise, and flight navigation and safety.

8.    Therefore, Plaintiffs seek an order from the Court overturning BOEM's and NOAA/Fisheries' unlawful management decisions and requiring these agencies to comply with NEPA and the ESA.

## II.    JURISDICTION AND VENUE

9.    The Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) (ESA); 28 U.S.C. §§ 1331 (federal questions), 1346 (United States as defendant), 2201 (declaratory judgment), and 2202 (injunctive relief); and 5 U.S.C. §§ 701 through 706 (APA).

10.    Pursuant to 16 U.S.C. § 1540(g), On May 24, 2021, Plaintiffs sent a 60-day notice of intent (NOI) to sue to NOAA/Fisheries and BOEM over their respective failures to comply with the ESA when reviewing and approving the Vineyard Wind project, including issuance of the Project's BiOp, dated September 11, 2020.  On July 24, 2021, NOAA/Fisheries responded to Plaintiff's NOI, stating that BOEM had requested re-consultation under ESA section 7 to address new data that might bear upon Vineyard Wind's impacts on listed species, including the North Atlantic Right

Whale.  NOAA/Fisheries also indicated the re-consultation effort would result in a new BiOp that would supersede the current BiOp, which was issued on September 11, 2020. However, NOAA/Fisheries gave no expected date for the new BiOp.  In addition, NOAA/Fisheries stated explicitly that the current BiOp would remain in effect until the new BiOp was issued.  As of the date of this filing, NOAA/Fisheries has not issued a new BiOp.  Thus, the BiOp issued on September 11, 2020 – which was the subject of Plaintiffs' NOI dated May 24, 2021 – remains in effect.

11.    For all claims brought under the APA, Plaintiffs have exhausted all administrative remedies available to them.

12.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiff ACK RATs is incorporated and based in Nantucket, Massachusetts, and its members reside in Massachusetts.   In addition, Plaintiff Vallorie Oliver resides in Nantucket, Massachusetts.  Finally, the Vineyard Wind project, which is the subject of the federal actions challenged herein, is to be constructed an operated in waters off the coast of Massachusetts and will cause environmental impacts in Massachusetts.

### III.   PARTIES

13.    Plaintiff ACK RATs (which stands for Nantucket Residents Against Turbines) is a 501(c)(3) non-profit corporation established to protect the natural and human resources that are threatened by BOEM's massive offshore wind energy program and its component elements, including the Vineyard Wind project. Members

of ACK RATs will be able to view the proposed wind farm from public and private vantage points on Nantucket.  In addition, ACK RATs members routinely travel on, through, and over coastal waters that would be affected by the Vineyard Wind project, including waters that support marine mammals and turtles listed as endangered or threatened under the ESA.  ACK RATs and its members have an interest in protecting these species.  ACK RATs and its members also have an interest in protecting the cultural and historical heritage of this part of New England from the impacts of the Vineyard Wind project.  The failure of BOEM and NOAA/Fisheries to comply with NEPA and the ESA will degrade the natural and human environment in Nantucket, resulting in harm to ACK RATs and its members.

14.    Plaintiff VALLORIE OLIVER is an individual who resides in Nantucket and has done so her entire life.  She travels on and through and makes use of the waters around Nantucket.  She considers it her responsibility to protect those waters and all the plant and animal life within it.  She also routinely visits the beaches long Nantucket's southerly and westerly shores, where currently the vistas are unobstructed.  This will change once the Vineyard Wind project is constructed, as the Project's wind turbines will be clearly visible from the Nantucket shoreline. The proposed Vineyard Wind project – as well as BOEM's entire offshore wind program – threatens the very resources that make Nantucket the unique place that Ms. Oliver has chosen to call home.  Ms. Oliver is also deeply committed to the historical heritage of Nantucket, which the Vineyard Wind project is sure to damage.  The

failure of BOEM and NOAA/Fisheries to comply with NEPA and the ESA will degrade the natural and human environment in Nantucket, resulting in harm to Ms. Oliver.  Ms. Oliver is a founding member of ACK RATs.

15.    Defendant UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT ("BOEM") is an agency of the United States government within and under the jurisdiction of the Department of the Interior.  BOEM's stated mission "is to manage development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."  For purposes of this action, BOEM is the federal agency that issues leases and permits for offshore wind projects such as Vineyard Wind.  BOEM is also responsible for ensuring that its actions, including authorization of offshore wind projects, comply with NEPA and the ESA.  To this end, BOEM must prepare the requisite NEPA document (either an Environmental Assessment (EA) or EIS) and must consult with NOAA/Fisheries whenever any of its actions has the potential to jeopardize a listed species.  Here, BOEM prepared the Final EIS for the Vineyard Wind project; consulted with NOAA/Fisheries regarding the project's impacts on listed species; and approved the project pursuant to a Record of Decision (ROD) issued on May 10, 2021.  In addition, BOEM must ensure that all projects it approves comply with the Outer Continental Shelf Lands Act (43 U.S.C. §§ 1331, *et seq.*)

16.    Defendant NOAA/FISHERIES is an agency of the United States Government within and under the jurisdiction of the Department of Commerce.

According to its mission statement, NOAA/Fisheries "is responsible for the stewardship of the nation's ocean resources and their habitat."  In addition, NOAA/Fisheries must use "sound science" and an "ecosystem-based" approach to managing the nation's ocean resources, a task which includes the "recovery and conservation of protected resources" such as marine mammals and fish listed under the ESA and Marine Mammal Protection Act.  Among the species within the regulatory and protective jurisdiction of NOAA/Fisheries are the whales (including the North Atlantic Right Whale), sea turtles, and listed fish species that will be adversely affected by the Vineyard Wind project. NOAA/Fisheries does not approve offshore wind projects.  Instead, pursuant to Section 7 of the ESA, NOAA/Fisheries engages in consultation with BOEM to determine whether and to what extent a proposed offshore wind project will jeopardize listed species within NOAA/Fisheries jurisdiction or adversely modify their critical habitat.  If it appears that a given project has the potential to take or jeopardize a listed species or adversely modify its habitat, NOAA/Fisheries must prepare a Biological Opinion ("BiOp") setting forth its analysis and identifying reasonable and prudent measures to avoid or minimize take of listed species.  If necessary, the BiOp must also include an authorization to take a certain number of particular listed species.  In this case, NOAA/Fisheries engaged in consultation with BOEM over the potential impacts of the Vineyard Wind project on listed species and, based on that consultation, prepared and issued a BiOp dated September 11, 2020.  Plaintiffs have been informed that BOEM and NOAA/Fisheries

*COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF*

have initiated re-consultation on the Vineyard Wind project but that the original BiOp issued on September 11, 2020, remains in effect.

17.    Defendant DEB HAALAND is the Secretary of the United States Department of the Interior and, among other things, is charged with overseeing the management of the nation's continental shelf lands and oceans, including those affected by the Vineyard Wind project.  In this regard, Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM.  Further, Secretary Haaland is responsible for ensuring that all agencies within the Department of the Interior, including BOEM, comply with NEPA, the ESA, and the Outer Continental Shelf Lands Act.  In this action, Plaintiffs are suing Secretary Haaland in her official capacity as Secretary of the Interior.

18.    Defendant GINA RAIMONDO is the Secretary of the United States Department of Commerce and, among other things, is charged with overseeing commercial activities within the United States and abroad.  Among the agencies under Secretary Raimondo's supervision is NOAA/Fisheries.  Thus, Secretary Raimondo is responsible for ensuring that NOAA/Fisheries complies with the ESA.  In this action, Plaintiffs are suing Secretary Raimondo in her official capacity as Secretary of Commerce.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   LEGAL BACKGROUND

### A.     The National Environmental Policy Act (NEPA)

19.    The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment." 42. U.S.C. § 4321.  NEPA's fundamental purposes are to guarantee that agencies take a "hard look" at the environmental consequences of their actions before such actions occur.  To conduct a "hard look" the agency in question must (1) carefully consider detailed information regarding the action's potentially significant environment effects, and (2) make relevant information available to the public so that it may play a role in both the decision-making process and the implementation of the decision itself.  See, e.g., 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

20.    For any "major federal action" that "significantly affects" the "human environment," NEPA requires the federal agency in question (here, BOEM) to prepare a detailed EIS that analyzes and discloses the action's environmental consequences.  42 USC § 4332(c); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).  If the agency does not conduct this analytical "hard look" prior to the point of commitment, the agency deprives itself of the ability to "foster excellent action."  *See* 40 CFR § 1500.1(c); *Marsh v. Oregon Nat. Resources Council,* 490 U.S. 360, 371 (1989).

21.    Relatedly, NEPA requires that the EIS fully analyze all direct, indirect, and cumulative impacts of a proposed federal action or project.  40 CFR § 1502.16. Direct effects include those "which are caused by the action and occur at the same time and place."  40 CFR § 1508.8(a).  Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 CFR § 1508(b).  Indirect effects may also include growth inducing impacts and other effects that prompt changes in land use patterns, population density or growth rates, and related effects on air and water and other natural systems, including ecosystems.  *Ibid.*  Cumulative impacts include those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over time. 40 CFR § 1508.7.

22.    The EIS must provide a complete and accurate discussion of the proposed project's foreseeable environmental impacts, including those that cannot be avoided.  5 USC § 706(2)(D); 40 CFR § 1502.22.  However, when information is incomplete or unavailable, the EIS must "always make clear that such information is lacking." 40 CFR § 1502.22.  And if the missing information can be feasibly obtained and is necessary for a "reasoned choice among alternatives," the agency must include

the information in the EIS.  *Ibid.* Where the cost of the data is too expensive to secure, the agency must still attempt to analyze the impacts in question.  *Ibid.*

23.    The EIS must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA."  *Natural Resources Defense Council v. U.S. Forest Serv.,* 421 F.3d 797, 812 (9th Cir. 2005). An EIS that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of the proposed agency action."  *Id.,* at 811.  For this reason, erroneous factual assumptions and misrepresentations of important facts can fatally undermine the information value of the EIS to the public and decision-makers.  *Id.,* at 808.

24.    In addition, if the EIS identifies a significant effect, the EIS must propose and analyze "appropriate mitigation measures."  40 CFR § 1502.14; *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352-53 ["omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA"].  Finally, the EIS must examine a reasonable range of alternatives to the proposed action, and focus on those that reduce the identified impacts of that action.  42 U.S.C. § 4332(2)(e); 40 CFR § 1502.1. So important is the alternatives analysis that the Council on Environmental Quality (CEQ) regulations describe it as the "heart" of the EIS.  40 CFR § 1502.14.  These

same regulations require the agency to "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 CFR § 1502.14(a).

**B.     The Endangered Species Act**

25.   *Listing of Species.*  For purposes of marine species (including marine mammals, pelagic fish, anadromous fish, and coral), the ESA requires the Secretary of the Commerce to issue regulations listing species as endangered or threatened based on the present or threatened destruction, modification, or curtailment of a species' habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the species' continued existence.  16 U.S.C. § 1533(a)(1).  An endangered species is one "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(a). A threatened species is one that will become endangered if current circumstances continue.  The ESA requires the Secretary to make listing decisions "solely on the basis of the best scientific and commercial data available."   16 U.S.C. § 1533(b)(1)(A).  Only if officially listed does a species receive the full protection of the ESA.  The ultimate goal of the ESA is to conserve and recover species so that they no longer require the protections of the Act.  16 U.S.C. §§ 1533(b), 1532(3). The Secretary has delegated the task of listing marine species under the ESA to NOAA/Fisheries.

26. *Critical Habitat.* Concurrently with listing a marine species as threatened or endangered, the Secretary of Commerce, must also designate the species' "critical habitat". 16 U.S.C. § 1533(b)(2). "Critical habitat" is the area that provides the physical and biological features essential to the conservation of the species and which may require special protection or management. 16 U.S.C. § 1532(5)(A). The ESA requires the Secretary to make critical habitat designations and amendments "on the best scientific data available." 16 U.S.C. § 1533(b)(2). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3). This definition of "conservation" is broader than mere survival; it also includes recovery of the species. *Id.* The Secretary has delegated the task of designating critical habitat for listed marine species to NOAA/Fisheries.

27. *Recovery Plans.* Section 4(f) of the ESA requires the Secretary of Commerce to develop and implement plans for the conservation and survival of endangered and threatened marine species. Such plans are typically referred to as "Recovery Plans". Recovery Plans must describe site-specific management actions that may be necessary to achieve the conservation and survival of the species; set forth objective, measurable criteria which, if met, would support a determination that the species can be removed from the ESA list; estimate the time and cost necessary to

implement those measures needed to achieve the plan's goals.   16 U.S.C. § 1533(f)(1).

28.   *Duty to Conserve.*  Federal agencies have an affirmative duty to promote the conservation and recovery of threatened and endangered species.  Section 2(c) of the ESA provides that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of the Act."   16 U.S.C. § 1531(c)(1).   Section 7(a) also establishes an affirmative duty to conserve listed species.  16 U.S.C. § 1536(a)(1).  The duty to conserve applies to the Secretary of the Interior, the Secretary of Commerce, BOEM, and NOAA/Fisheries.

29.   *Duty to Insure Survival and Recovery; Duty to Consult.*  Section 7(a) mandates that all federal agencies "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species . . . determined . . . to be critical . . . ."  16 U.S.C. § 1536(a)(2).   To fulfill this mandate, the acting agency must prepare a biological assessment to identify all endangered and threatened species likely to be affected by the action.  U.S.C. § 1536(c)(1).  Where, as here, the affected species are marine animals, the acting agency must consult with NOAA/Fisheries to determine the extent of the impact to the species in question and identify measures to minimize take.

30.   *Biological Opinion.*   Following consultation under Section 7(a)(2), NOAA/Fisheries must prepare a Biological Opinion (BiOp) that determines whether the proposed action is likely to jeopardize the continued existence of a listed marine species or destroy or adversely modify a marine species' designated critical habitat. The BiOp must summarize the information on which it is based and analyze how the proposed action would affect listed species and their critical habitat.  If the BiOp concludes the action has the potential to jeopardize the species or adversely modify its critical habitat, the BiOp must include an Incidental Take Statement which specifies the impact of any incidental taking, provides reasonable and prudent measures to minimize such impacts, and sets forth terms and conditions that must be followed.   16 U.S.C. § 1536(b)(4).   Where an agency action may affect a listed species, the absence of a valid BiOp means that the acting agency (here, BOEM) has not fulfilled its duty to insure through consultation with NOAA/Fisheries that its actions will neither jeopardize a listed species nor destroy or adversely modify the species' critical habitat.

31.   The BiOp must evaluate the "cumulative effects on the listed species." 50 CFR § 402.14(g)(3).  Cumulative effects include those of other federal actions, as well as those of "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 CFR § 402.02.

32.     The BiOp must use the "best scientific and commercial data available."

16 U.S.C. § 1536(a)(2); 50 CFR § 402.14(d).  In addition, the BiOp must consider all

relevant evidence and factors, and articulate a rational connection between the facts

and its ultimate conclusions.

33.     *Prohibition Against Unauthorized "Take".*  Section 9 of the ESA and its

implementing regulations prohibit any person from "taking" a threatened or

endangered species.  16 U.S.C. § 1538(a)(1); 50 CFR § 17.31.  A "person" includes

private entities, such as the applicant for the Vineyard Wind project, as well as local,

state, and federal agencies.  16 U.S.C. § 1532(13).  The ESA defines "take" broadly

to include harming, harassing, trapping, capturing, wounding, or killing a listed

species either directly or by degrading its habitat to such an extent that it impairs or

disrupts that species' essential behaviors.  16 U.S.C. § 1532(19).  However, there is

an exception to the Section 9 prohibition on take.  A public agency or private party

may take listed species if they secure an Incidental Take Statement from either the

United States Fish and Wildlife Service (for take of terrestrial and freshwater species)

or NOAA/Fisheries (for take of marine and anadromous species).  16 U.S.C. §

1536(b)(4).  So long as the permittee complies with the terms and conditions of the

Incidental Take Statement, no take violation of Section 9 will occur.  16 U.S.C. §

1536(o)(2).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.  FACTUAL BACKGROUND

**A.    Project Description**

34.    In December 2017, Vineyard Wind LLC (Vineyard Wind) submitted to BOEM a Construction and Operation Plan (COP) for an 800-megawatt wind energy facility on the Outer Continental Shelf (OCS) off the Massachusetts coast (the "Project").  The COP proposes installing up to 100 wind turbine generators and one or two offshore substations or electrical service platforms.  The Project would be located approximately 14 miles southeast of Martha's Vineyard and a similar distance southwest of Nantucket, within federal Lease Area OCS-A 0501.  The turbines would be located in water depths ranging from 121 to 161 feet.  According to the COP, the Project will include one export/transmission cable landfall near the town of Barnstable, Massachusetts.  Staging and onshore construction of Project components will take place at the New Bedford Marine Commerce Terminal.

36.    The Project will not operate as an isolated or individual offshore wind array, but rather will be part of a constellation of windfarms slated for installation on adjoining leaseholds – all of them located within 15 to 20 miles of Martha's Vineyard and Nantucket.  Specifically, the Vineyard Wind 1 leasehold (OCS-A 0501), which is the subject of this action, is immediately west of and adjacent to offshore wind Lease Area OCS-A 0520, which is adjacent to offshore wind Lease Area OCS-A 0521, which is adjacent to offshore wind Lease Area OCS-A 0522.  The Vineyard Wind 1

leasehold is also immediately east and adjacent to offshore wind Lease Area OCS-A 500, which is within a mile of offshore wind Lease Area OCS-A 0487, which is adjacent to offshore wind Lease Areas OCS-A 0517 and 0486.  When taken together, these eight (8) offshore wind Lease Areas will be home to more than 600 wind turbines, all of them extending from the sea floor, through the water column, into the sky.  Each of these 600+ wind turbines will reach more than 650 feet above the surface of the ocean and many will be visible from Nantucket and Martha's Vineyard.

**B.     The Draft EIS**

37.    As required by NEPA, BOEM prepared a Draft EIS for the Vineyard Wind Project, and released it for public review and comment on December 7, 2018. According to the Federal Register notice, the public comment period was to close on January 22, 2019.    The Draft EIS concluded that the Project would not have any significant/major Project-related impacts on aesthetics, air quality/greenhouse gases (GHGs), biological resources, cultural resources, or hazards.

38.    By letter dated January 22, 2019, Plaintiffs submitted comments to BOEM identifying deficiencies in the Draft EIS.  These included the following:

- General
  - o   Inadequate explanation of the Project' "Purpose and Need"
  - o   No Analysis of the Project's growth inducing impacts
  - o   Inadequate range of alternatives
  - o   Inadequate cumulative impacts analysis

- o Inadequate and unsupported thresholds for determining impact significance

- Aesthetics

  - o Inadequate assessment of the Project' impacts on views from Nantucket Island.

  - o No evidentiary support for Draft EIS conclusion that the Project's aesthetic impacts would be "minor".

- Air Quality and GHG Emissions

  - o Inadequate analysis and disclosure of Project's construction-related emissions of pollutants subject to National Ambient Air Quality Standards (NAAQS).

  - o Inadequate analysis and disclosure of Project's construction-related emissions of GHGs.

  - o Inadequate analysis of Project's operational emissions.

- Biology

  - o Inadequate assessment of Project's potential to cause loss of foraging habitat for migratory birds.

  - o Inadequate analysis of Project's impacts on whale echolocation.

  - o Inadequate assessment of Project's noise impacts on whale behavior.

o Inadequate assessment of Project's potential to cause vessel collisions with whales.

o Inadequate evidence to support Draft EIS conclusion that Project impacts on North Atlantic Right Whales will be "minor".

o Indecipherable tables showing noise impacts on whales.

o Inadequate evidence to support Draft EIS claim that "soft start" construction activities will reduce project-related noise impacts on listed marine species.

o Inadequate analysis of Project's operational noise impacts on whales and other marine mammals.

o Inadequate analysis of Project's EMF (electromagnetic field) impacts on listed sea turtles.

o Inadequate assessment of Project impacts on soft seabed habitat.

o Inadequate assessment of Project's operational impacts on birds, including three listed species.

o Failure to analyze and quantify magnitude of Project's bird collision impacts.

o Draft EIS avian abundance maps lack key information and mislead the public.

o  Inadequate analysis of Project's impacts on listed bat species.

o  Inadequate analysis of Project's impacts on water circulation, benthic morphology, and associated biological resources and processes.

o  Inadequate mitigation for Project's impacts on benthic resources.

o  Inadequate and misleading analysis of Project's impacts on invertebrate and fish habitat.

o  Inadequate analysis of Project's construction impacts on fish, such as winter flounder, American lobster, and monkfish.

o  Failure to provide data from Essential Fish Habitat study.

o  Underreporting of Project's impact on flounder.

o  Sound-Distance Noise table is indecipherable.

o  Inadequate analysis of Project's pile-driving impacts on fish.

o  Failure to assess Project's sub-lethal impacts on fish.

o  Inadequate analysis of Project's "decommissioning" noise impacts on marine species.

o  Failure to assess whether and to what extent Project will use anti-fouling paint, which has adverse impacts on marine species.

*COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF*

- o Failure to analyze Project's potential to increase local water temperature and thereby affect biotic resources.

- o Failure to analyze impact of Project vessels discharging untreated waste and ballast water into area of potential effect (APE).

- o Failure to analyze Project's potential to introduce invasive species into the APE.

- Cultural Resources

    - o Draft EIS improperly defers analysis of Project's impacts on cultural resources.

    - o Inadequate assessment of Project's impacts on shipping and fishing heritage of Nantucket.

- Hazards

    - o No analysis of hazard impacts associated with oil stored and used in Project's wind turbines.

    - o No analysis of Project's potential hazard impacts to local watercraft.

39.    On February 11, 2019, BOEM held a "town hall" meeting on Nantucket to describe the Vineyard Wind project and respond to questions from the public.

40.     On February 22, 2019, Plaintiffs submitted a second letter to BOEM, in response to the information presented at the February 11 town hall meeting.   This letter identified additional defects in the Draft EIS, including the following:

- Failure to adequately analyze Project-related hazards to commercial fishing activities.

- Failure to adequately assess Project's potential to damage lobster, squid, and flounder fisheries.

- Inadequate and misleading simulations of Project's visual impacts.

- Draft EIS's cumulative impact analysis ignores wind power leases adjacent or proximate to the Vineyard Wind 1 leasehold.

- Inadequate mitigation for potential impacts on North Atlantic Right Whales.

## C.     The Supplement to the Draft EIS

41.     In late 2019, BOEM announced that it would be preparing a Supplement to the Draft EIS for purposes of analyzing the Project's *cumulative* impacts within the context of the other offshore wind projects whose leaseholds are adjacent to or near that of Vineyard Wind 1.

42.     On June 12, 2020, BOEM released the Supplement to the Draft EIS (SEIS) for public review and comment.

43.     By letter dated July 27, 2020, Plaintiffs submitted comments to BOEM indicating that the SEIS had not addressed the deficiencies described in Plaintiffs'

prior comment letters regarding the Draft EIS.  Plaintiffs' July 27, 2020 letter also identified additional defects in the SEIS's alleged "cumulative" analysis of the Project's impacts.  These included the following:

- Failure to explain the meaning of the terms "negligible", "minor", "moderate", and "major" with respect to Project-related impacts; failure to explain how such terms were derived.

- Failure to analyze the Project's impacts in conjunction with those of the other offshore wind projects currently proposed for the coast of New England.

- Failure to quantify the Project's cumulative impacts.

- Failure to determine and explain whether the Project's cumulative impacts will have a significant effect on biological resources.

- Failure to explain or analytically account for the increase in number of Project wind turbines to be installed.

- Inadequate description of benthic resources in the cumulative Area of Potential Effect (APE).

- Inadequate analysis of Project's cumulative impacts on fin fish.

-  Inadequate analysis of Project's cumulative impacts on marine mammals, especially the North Atlantic Right Whale.

- Inadequate, piecemeal assessment of Project's impacts on marine species.

- Inadequate discussion of scientific literature relevant to impacts on marine mammals, including North Atlantic Right Whales.

- Failure to account for GHG reduction benefits of whales and how the Project and the other offshore wind projects, by causing whale mortality, will cause those benefits to disappear.

- Inadequate analysis of Project's cumulative impacts on birds.

- Failure to assess the fossil-fuel energy required to produce, install, and operate Vineyard Wind 1 and the other offshore wind projects contemplated under BOEM's offshore wind energy program.

- Inadequate assessment of Project's cumulative impacts on aesthetics/visual resources, especially given that the size and height of the wind turbines had increased since release of the Draft EIS.

- Inadequate assessment of Project's cumulative potential to release invasive species into the APE through discharge of vessel ballast water.

- Incomplete list of cumulative projects.

**D.   The Vineyard Wind BiOp Issued By NOAA/Fisheries**

43.   In 2019 and 2020, while it was preparing the SEIS, BOEM was engaged in ESA section 7 consultations with NOAA/Fisheries regarding the Project's potential impacts on federally-listed threatened and endangered species.

27

44.   The Section 7 consultation culminated in a BiOp, which NOAA/Fisheries issued on September 11, 2020.  The BiOp was not released to the public for review or comment.

45.   The BiOp concludes that the Project is not likely to jeopardize the following listed species: fin whales, sei whales, sperm whales, blue whales, North Atlantic Right Whales, loggerhead sea turtles, green sea turtles, Kemp's ridley or leatherback sea turtles, and Atlantic sturgeon.

46.   The BiOp also concludes that the Project will/will not adversely modify designated critical habitat for the North Atlantic Right Whale.

47.   The BiOp includes an Incidental Take Statement through which BOEM may authorize Vineyard Wind to take the following listed species: fin whales, sei whales, sperm whales, North Atlantic Right Whales, loggerhead sea turtles, green sea turtles, Kemp's ridley, and leatherback sea turtles.

48.   The BiOp was and remains legally deficient.  By approving and issuing a legally deficient BiOp for the Project, NOAA/Fisheries violated the procedural and substantive mandates of the ESA.

49.   On May 24, 2021, pursuant to the Citizen Suit provisions of the Endangered Species Act, Plaintiffs submitted to NOAA/Fisheries a "60-Day Notice of Intent to Sue," setting forth in detail the various deficiencies in the September 11, 2020 BiOp that NOAA/Fisheries issued for the Vineyard Wind Project.  The letter concludes by stating that if NOAA/Fisheries does not correct the deficiencies therein

described, the Plaintiffs would file suit in federal court and request an order invalidating the BiOp.

48.    On July 23, 2021, counsel for Plaintiffs received an email from the legal department at NOAA/Fisheries, stating that BOEM had requested re-consultation under Section 7 of the ESA, and that such re-consultation would result in a new BiOp for the Project.  According to the email, the new BiOp, when issued, would supersede the BiOp issued on September 11, 2020 (the "original/current BiOp").  The email expressly stated, however, that the original/current BiOp would remain in full force and effect until the new BiOp was issued, the timing for which was not provided.  As of the date of this complaint, the original/current BiOp – which is the subject of Plaintiff's 60-day Notice of Intent to Sue letter – is still in effect.

**E.    Vineyard Wind's Withdrawal and "Resubmittal" of Project**

49.    On November 3, 2020, the United States presidential election was held. In that election, Joseph Biden defeated Donald Trump, ushering in a change in administration.

50.    Plaintiffs are informed and believe, and on that basis allege, that Vineyard Wind was concerned that the out-going Trump Administration would deny its Project in whole or in part, prior to the inauguration of President-elect Biden.

51.    On December 14, 2020, United States Solicitor Daniel H. Jorjani submitted a legal memorandum to then-Secretary of the Interior, David Bernhardt, stating that the offshore wind projects currently proposed for the Atlantic seaboard,

*COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF*

including Vineyard Wind, would unreasonably interfere with activities protected under the Outer Continental Shelf Lands Act (OCSLA). 43 U.S.C. § 1337(p). According to Mr. Jorjani's memorandum, this unreasonable interference rendered the offshore wind projects inconsistent and incompatible with the OCSLA.

52. Plaintiffs are informed and believe, and on that basis allege, that Vineyard Wind learned of Mr. Jorjani's memorandum and, fearing that its Project would be denied, withdrew its Project and COP from further consideration by BOEM on December 14, 2020.

53. On January 20, 2021, Joseph Biden was inaugurated as the 46th President of the United States. On or about January 22, 2021, Vineyard Wind resubmitted its Project. BOEM allowed the Vineyard Wind Project to proceed as if the Project had not been withdrawn. Thus, no new NEPA or ESA documents were required or prepared, and BOEM continued to process the Project under the pre-existing Draft EIS, SEIS, and BiOp.

**F.     The Final EIS and Record of Decision**

54. BOEM issued the Final EIS for the Vineyard Wind Project on March 12, 2021. It consisted of the Draft EIS and the SEIS, as well as related appendices. The Final EIS did not mention any potential conflict between the Project and the OCSLA.

55. By letter dated April 7, 2021, Plaintiffs submitted comments to BOEM identifying new and continuing deficiencies in the Final EIS.

56.    On May 10, 2021, BOEM approved the Final EIS and COP for the Project, setting forth both actions in a Record of Decision (ROD) published in the Federal Register.

57.    The ROD constituted final agency action regarding the Vineyard Wind Project and its accompanying Final EIS.  BOEM's approval of the Project through the ROD also constitutes final agency action for purposes of Section 7 of the ESA.

58.    In issuing the ROD and approving the Project and its defective Final EIS, BOEM violated the procedural and substantive mandates of NEPA and the ESA.

## VI.    CLAIMS FOR RELIEF

59.    For each of the Claims in this Complaint, Plaintiffs incorporate by reference each and every allegation set forth in this Complaint.

### First Claim for Relief

### (Against BOEM for Violating NEPA)

60.    BOEM has violated NEPA and its implementing regulations by issuing a ROD for the Vineyard Wind Project, and by approving the Final EIS for the Project, despite the Final EIS's procedural and substantive defects. 42 U.S.C. § 4331, *et seq*; 40 CFR § 1500, *et seq*.  The Final EIS, and the ROD that formalized its approval, are arbitrary and capricious and otherwise not in accordance with the law in violation of 5 U.S.C. § 706.

61.    An EIS must provide a detailed statement of: (1) the environmental impacts of the proposed action; (2) any adverse environmental effects that cannot be

avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources that would be involved in the action should it be implemented.  42 U.S.C. § 4332(C).  An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 CFR § 1502.1. NEPA also requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative impacts of the proposed action and to take a hard look at those impacts.  40 CFR §§ 1508.7, 1508.8.  In addition, NEPA requires federal agencies to consider mitigation measures to minimize the environmental impacts of a proposed action.  40 CFR § 1502.14 (alternatives and mitigation measures); 40 CFR § 1502.16 (environmental consequences and mitigation measures).

62.    The ROD and Final EIS that BOEM prepared and approved for the Vineyard Wind Project failed to comply with each of these NEPA requirements.  The Final EIS does not analyze an adequate range of alternatives; nor does it adequately analyze the Project's impacts on the human and natural environment, as discussed in Plaintiffs' comment letters to BOEM and as set forth in this Complaint.  The Final EIS also fails to consider mitigation measures capable of reducing the action's impacts on human and natural resources and relies on outdated, inaccurate,

incomplete, and inadequate information when assessing the impacts of the proposed action.

63.     For each of the reasons set forth above, BOEM's adoption of the ROD and Final EIS for the Vineyard Wind Project was arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA.

**Second Claim for Relief**

**(Against NOAA/Fisheries for Issuing Legally Deficient BiOp)**

64.     In issuing the September 11, 2020 BiOp for the Vineyard Wind Project (GARFO-2019-00343), NOAA/Fisheries acted arbitrarily, capriciously, and unlawfully because the conclusions set forth in the BiOp were not based on the best available science, as required by the ESA.  16 U.S.C. § 1536(a)(2).

65.     NOAA/Fisheries' issuance of the BiOp was arbitrary, capricious, and unlawful because the BiOp failed to adequately address the proposed action's individual and cumulative impacts on federally-listed species, including the North Atlantic Right Whale, and relied on unproven, unsupported, and ineffective measures to protect such species from take and other forms of harm.

66.     NOAA/Fisheries' issuance of the BiOp was arbitrary, capricious, and unlawful because the BiOp included an Incidental Take Statement that underreported and underestimated the number of individuals of each affected listed species that

would be taken by the proposed action.  The Incidental Take Statement also failed to include a complete or effective set of reasonable and prudent measures that would minimize impacts, including taking, on the affected listed species.   16 U.S.C. § 1536(b)(4).

67.    For each of the reasons set forth above, and the reasons described in Plaintiffs' 60-Day Notice of Intent to Sue letter, NOAA/Fisheries' issuance of the September 11, 2020 BiOp was arbitrary, capricious, and unlawful.  5 U.S.C. §§ 701-706.

### Third Claim for Relief

### (Against BOEM and NOAA/Fisheries for Violating the ESA by Failing to Insure Against Jeopardy)

68.    BOEM and NOAA/Fisheries violated, and continue to violate, Section 7(a)(2) of the ESA and its implementing regulations by failing to ensure through consultation that BOEM's approval of the proposed Vineyard Wind Project will not jeopardize the North Atlantic Right Whale and other federally-listed species within the APE.

69.    BOEM is violating the ESA by carrying out the actions necessary to implement the Vineyard Wind Project, despite the fact that the September 11, 2020 BiOp is legally defective and based on inadequate scientific data.  NOAA/Fisheries violated the ESA by authorizing BOEM to take the actions necessary to the implementation of the Vineyard Wind Project – actions that will jeopardize the

federally-listed species within the APE. Such violations are subject to judicial review pursuant to 16 U.S.C. § 1540(g).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Adjudge and declare that Defendant BOEM's approval of the ROD for the Vineyard Wind Project, including its Final EIS, violates NEPA and its implementing regulations;

(2)     Adjudge and declare that Defendant NOAA/Fisheries September 11, 2020 BiOp for the Vineyard Wind Project (GARFO-2019-00343) was arbitrary, capricious, and unlawful;

(3)     Adjudge and declare that Defendant NOAA/Fisheries September 11, 2020 BiOp for the Vineyard Wind Project (GARFO-2019-00343) violates Section 7(a)(2) of the ESA because it concludes, with insufficient evidence, that BOEM's action (i.e., approval of the Vineyard Wind Project) will not jeopardize the North Atlantic Right Whale or any other federally-listed species;

(4)     Adjudge and declare that Defendant BOEM's approval of the Vineyard Wind Project violates Section 7(a)(2) of the ESA because BOEM has failed to insure that its actions do not jeopardize the North Atlantic Right Whale and all other federally-listed species potentially affected by the Project;

(5)     Order Defendant NOAA/Fisheries to vacate and set aside the September 11, 2020 BiOp for the Vineyard Wind Project;

(6)    Order Defendant BOEM to vacate and set aside the ROD for the Vineyard Wind Project and its attendant Final EIS;

(7)    Pending completion of an adequate BiOp for the Vineyard Wind Project, enjoin Defendants BOEM and NOAA/Fisheries from issuing any permit, approval, or other action within the Vineyard Wind APE or elsewhere that could adversely affect federally-listed species;

(8)    Pending completion of an adequate EIS for the Vineyard Wind Project, enjoin Defendant BOEM from issuing any permit, approval, or other action that might adversely affect the human or natural environment;

(9)    Award Plaintiffs their fees, costs, expenses and disbursements, including reasonable attorneys' fees as provided by the ESA, 16 U.S.C. § 1540(g)(4), or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(10)   Grant Plaintiffs such additional and further relief as the Court deems just and proper.

> The Plaintiffs,
> ACK Residents Against Turbines
> and Vallorie Oliver,
> By Their Attorney,
>
> /s/ Steven P. Brendemuehl
> Steven P. Brendemuehl (BBO# 553225)
> Law Office of Steven P. Brendemuehl
> 5 Commonwealth Road ~ Suite 4A
> Natick, MA 01760
> Phone: 508-651-1013
> Fax:    508-651-0508
> steven@lawofficespb.com

DATED: August 25, 2021

*Complaint For Declaratory And Injunctive Relief*